T.C. Memo. 1997-147


UNITED STATES TAX COURT


MILO G. AND SARAH E. CHAPMAN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20342-94, 20363-94,  Filed March 20, 1997.
              20560-94.


<u>Joann K. Beck</u>, for petitioners.

<u>Kathey I. Shaw</u>, for respondent.


MEMORANDUM OPINION


HAMBLEN, <u>Judge</u>:  By four separate notices of deficiency,
respondent determined deficiencies, additions to tax, and

---

[1]Cases of the following petitioners are consolidated
herewith:  David E. and Gladys A. Christie, docket No. 20363-94;
and Dura-Craft, Inc., docket No. 20560-94.

penalties in regard to petitioners' Federal income tax as follows:

Milo G. and Sarah E. Chapman--docket No. 20342-94

|       |            | Addition to Tax and Penalties | |
| Year  | Deficiency | Sec. 6653(a)(1) | Sec. 6662(a) |
| 1988  | $25,424    | $1,237          | ---          |
| 1989  | 12,429     | ---             | $2,357       |
| 1990  | 1,574      | ---             | 315          |

David E. and Gladys A. Christie--docket No. 20363-94

|       |            | Addition to Tax and Penalties | |
| Year  | Deficiency | Sec. 6653(a)(1) | Sec. 6662(a) |
| 1988  | $19,469    | $973            | ---          |
| 1989  | 10,846     | ---             | $2,040       |
| 1990  | 962        | ---             | 192          |

Dura-Craft, Inc.--docket No. 20560-94

| Taxable Year |            | Addition to Tax and Penalty | |
| Ending       | Deficiency | Sec. 6653(a)(1) | Sec. 6662(a) |
| 10/31/88     | $15,968    | $798            | ---          |
| 10/31/89     | 93,410     | ---             | $3,591       |

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:

(1) Whether petitioners Milo and Sarah Chapman and David and Gladys Christie received distributions from the Dura-Craft profit-sharing plan (Plan) in 1988 and 1989 pursuant to section 72(p);

(2) whether petitioners Milo and Sarah Chapman and David and Gladys Christie received early distributions from the Plan in 1988 and 1989 and therefore are liable under section 72(t) for the 10-percent additional tax for early distributions;

(3) whether petitioners Milo and Sarah Chapman and David and Gladys Christie constructively received interest income in 1989 from the payments by Dura-Craft, Inc. (Dura-Craft), and Springbrook Marketing (Springbrook) to the Plan;

(4) whether petitioners David and Gladys Christie received constructive dividends in 1989 from the loan repayments by both Dura-Craft and Springbrook to the Plan in amounts greater than those actually owed to the individual petitioners; and

(5) whether the 5-percent processing fees charged by Northwest Purchasing, Inc., were allowable as a part of Dura-Craft's cost of goods sold for fiscal years ending October 31, 1988 and 1989.

## Background

These consolidated cases were submitted without a trial pursuant to Rule 122. The stipulation of facts and the attached exhibits are incorporated by this reference, and the facts contained therein are found accordingly. Petitioners Milo Chapman and Sarah Chapman (collectively hereinafter referred to as the Chapmans) resided in Newberg, Oregon, at the time the petition was filed in docket No. 20342-94, and petitioners David Christie and Gladys Christie (collectively hereinafter referred

to as the Christies) resided in Aurora, Oregon, at the time the petition was filed in docket No. 20363-94. Dura-Craft, Inc., is a C corporation which maintained its principal place of business in Newberg, Oregon, at the time the petition was filed in docket No. 20560-94. During the years at issue, the Chapmans and the Christies prepared their respective joint Federal individual income tax returns using the cash receipts and disbursements method of accounting, and Dura-Craft prepared its Federal corporate income tax returns using an accrual method of accounting.

This case involves three closely held corporations and their shareholders. Northwest Purchasing, Inc. (Northwest), is a subchapter S corporation which is owned equally by David Christie and Milo Chapman. Northwest sells raw materials to Dura-Craft at Northwest's cost, plus a 5-percent processing fee. During the years at issue, Dura-Craft was owned by Milo Chapman (25 percent) and David Christie (75 percent). Dura-Craft manufactures doll house kits and sells these kits exclusively to Springbrook. During the years at issue, Springbrook was owned by Milo Chapman (75 percent) and David Christie (25 percent). Springbrook markets the doll house kits to various outside retailers such as Fred Meyer and Payless.

During the years at issue, Milo Chapman was an employee of Springbrook, and David Christie was both an officer and an employee of Dura-Craft. Milo Chapman controlled all of the

financial decisions of Springbrook.  His responsibilities included signing checks, hiring employees, and establishing new markets for the Dura-Craft kits.  David Christie controlled all of the financial decisions of Dura-Craft.  His responsibilities included signing checks, hiring employees, and making all major decisions concerning production and new kit designs.  Office management and bookkeeping for both Dura-Craft and Springbrook were performed at the office of Dura-Craft by employees of Dura-Craft.

A.  Loans

On February 10, 1983, the Chapmans and the Christies each requested a loan in the amount of $37,500 from the Dura-Craft Profit-Sharing Plan (Plan) to meet unspecified "emergency financial requirements".  On February 22, 1983, the Chapmans and the Christies each signed separate notes agreeing to pay $37,500 to the Plan, plus 12 percent interest, accruing from February 22, 1983, until the principal was paid.  On April 22, 1983, the Plan agreed to lend $37,500 to the Chapmans and $37,500 to the Christies at 12 percent interest, with a repayment date of December 31, 1984 (collectively hereinafter referred to as plan loans).[2]

---

[2]Nothing in the record indicates how to reconcile the fact that the date that the Plan agreed to make the loans was after the date that the individual petitioners signed separate notes agreeing to repay the loans.  We do not know whether this discrepancy is the result of inadvertence or was intentional.

Although the Plan agreed to these loans, the Plan instead paid $50,000 to Dura-Craft on February 22, 1983, and $25,000 to Springbrook on April 27, 1983. On February 22, 1983, Dura-Craft signed a note agreeing to pay David Christie and Milo Chapman a total of $50,000 plus 12 percent interest, and, on April 27, 1983, Springbrook signed a note agreeing to pay David Christie and Milo Chapman $25,000 plus 12 percent interest (collectively referred to as corporate loans).

In 1985, Dura-Craft paid David Christie $10,000 on its $50,000 corporate loan, and Springbrook paid Milo Chapman $10,000 on its $25,000 corporate loan. At that time, Dura-Craft reduced its loan payable balance reflected in its accounting records by the $10,000 it paid to David Christie. Springbrook also reduced its loan payable balance reflected in its accounting records by the $10,000 it paid to Milo Chapman. Due to an error, Springbrook included the 1985 $10,000 loan repayment to Milo Chapman on his 1985 Form W-2. Neither David Christie nor Milo Chapman reduced his loan balance with the Plan in 1985.

As of January 1, 1986, the accounting records of Dura-Craft had a loan payable balance to David Christie and Milo Chapman of $40,000, and the accounting records of Springbrook had a loan payable balance of $15,000.

On April 25, 1989, Springbrook paid the balance of its corporate loan by issuing a check to the Plan in the amount of $43,315 with the notation "princ $25,000 - int $18,315". On the

same day, Dura-Craft also paid the balance of its corporate loan by issuing a check to the Plan for $87,185 with the notation "princ $50,000, int $37,185". Dura-Craft's check register for the $87,185 check to the Plan bears the notation "Loan Payback from Milo-Dave-pd directly to Dura-Craft profit Share Trust."

Springbrook recorded the payment on its accounting records as follows:

| | |
|---|---|
| Wage expense | $10,000 |
| Interest expense | 18,315 |
| Loan payment | 15,000 |
| Paid to profit-sharing plan | 43,315 |

At the time of the payment, Springbrook's accounting records reflected a loan payable balance of $33,315. Springbrook computed and paid interest to the Plan on the full amount of its corporate loan despite the $10,000 loan payment which Springbrook made to Milo Chapman in 1985. Accordingly, as of the date of its payment, Springbrook owed to Milo Chapman and David Christie a total of $14,000 in interest rather than the $18,315 which was paid.

Dura-Craft recorded the $87,185 repayment on the same date in its accounting records as follows:

| | |
|---|---|
| Wage expense | $10,000 |
| Interest expense | 37,185 |
| Loan payment | 40,000 |
| Paid to profit-sharing trust | 87,185 |

At the time of the payment, Dura-Craft's accounting records reflected a remaining loan payable balance of $40,000. Nonetheless, Dura-Craft computed the interest owed based upon an

outstanding loan balance of $50,000 despite the $10,000 loan payment which Dura-Craft made to David Christie in 1985. Accordingly, as of the date of its payment, Dura-Craft owed interest to Milo Chapman and David Christie in the amount of $33,000 rather than the $37,185 which was paid.

On February 22, 1986, the loan principal and interest due to the Plan for each of the plan loans exceeded the statutory limit of $50,000, pursuant to section 72(p)(2)(A)(i). Total interest of $9,000 and $3,000 accrued on the plan loans during 1988 and 1989, respectively.

The Chapmans and the Christies did not report any income with respect to the corporate or plan loans. Respondent determined that the Chapmans and the Christies each received two plan distributions from the Plan pursuant to section 72(p): (1) In 1988, in the amount of the principal balance of $37,500 and one-half of the accrued interest ($4,500), and (2) in 1989, in an amount of one-half of the interest accruing during that year ($1,500). In addition, respondent determined that petitioners were liable for an additional 10-percent tax pursuant to section 72(t) on each distribution.

Respondent also determined that the Chapmans and the Christies each received the following amounts of income in 1989: (1) Dividends from Springbrook equal to one-half of the difference between interest of $14,000 owed by Springbrook on its corporate loan and the $18,315 actually paid by Springbrook to

the Plan ($2,158); (2) dividends from Dura-Craft equal to one-half of the difference between the $33,000 of interest owed by Dura-Craft on its corporate loan and the $37,185 actually paid by Dura-Craft to the Plan ($2,092); (3) interest income equal to one-half of the interest owed by Dura-Craft ($16,500) and by Springbrook ($7,000) on the respective corporate loans but paid to the Plan.

B.  Northwest

Northwest was incorporated in 1978 as a corporation electing small business status under subchapter S and is equally owned by David Christie and Milo Chapman.  During 1988, 1989, and 1990, Northwest had no employees and had the same telephone number, business address, and office space as Dura-Craft.  For its taxable years ending October 31, 1988 and 1989, Dura-Craft purchased all of its raw materials from Northwest.  Northwest sold Dura-Craft these raw materials at Northwest's cost, plus a 5-percent processing fee.  For the years ending October 31, 1988 and 1989, Dura-Craft paid Northwest processing fees of $39,840.83 and $55,572, respectively.  As Northwest had no employees, all of Northwest's orders were placed by Dura-Craft employees and delivered directly to the Dura-Craft plant.  Northwest maintained its own set of accounting records and filed its own tax returns for the taxable years ending July 31, 1989 and 1990.  Respondent disallowed the payments Dura-Craft claimed as cost of goods sold for taxable years ending October 31, 1988 and 1989.

## Discussion

Petitioners bear the burden of establishing that respondent's determinations of deficiencies, as contained in the statutory notices of deficiency, are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Petitioners' briefs refer to several facts which were not included in the parties' stipulation of facts.  Statements in briefs do not constitute evidence and will not be considered by the Court.[3]  Rule 143(b); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969).  The record of this case was closed prior to the submission of the parties' briefs. Accordingly, we hold that the additional facts contained in petitioners' briefs that were not part of the stipulation of facts or offered at trial are not a part of the record.

---

[3]Examples of statements in petitioners' briefs that are not in the record include:

> (1) [Northwest] was formed * * * by the Chapman and Chritie [sic] families for the purpose of locating and brokering wood products for sale to others; (2) David Christie oversees the administrative and accounting portions of Northwest Purchasing while Milo Chapman locates, evaluates and secures the raw materials purchased by [Northwest] for sale; (3) the services of Northwest's principals are not performed by anyone else.

I.  Issues 1-4.  Loans

The questions presented in the first four issues are related to the corporate and plan loans, and we discuss them correlatively.  Distributions from a qualified plan are taxable as provided in section 402(a).  The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 236(a), 96 Stat. 324, 509, added section 72(p).  Section 72(p)(1)(A) generally treats loans from a qualified employer plan to plan participants or beneficiaries as taxable distributions.  Section 72(p)(1)(A) provides:  "If during any taxable year a participant or beneficiary receives (directly or indirectly) any amount as a loan from a qualified employer plan, such amount shall be treated as having been received by such individual as a distribution under such plan."[4]  Section 72(p)(2)[5] provides an exception to

---

[4]Sec. 72(p)(1)(A) applies to any loan from a qualified employer plan which was made after Aug. 13, 1982.  Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 236(a), 96 Stat. 324, 510-511.

[5]Sec. 72(p)(2) provides in pertinent part:

(2) Exception for Certain Loans.--

    (A) General Rule.--Paragraph (1) shall not apply to any loan to the extent that such loan (when added to the outstanding balance of all other loans from such plan whether made on, before or after August 13, 1982), does not exceed the lesser of--

        (i) $50,000, reduced by the excess (if any) of--

            (I) the highest outstanding balance of loans from the plan

(continued...)

the general rule of section 72(p)(1) if the following

requirements are satisfied:  (1) The balance of all outstanding

_____

[5](...continued)
during the 1-year period ending on
the day before the date on which
such loan was made, over

(II) the outstanding balance
of loans from the plan on the date
on which such loan was made, or

(ii) the greater of (I) one-half of the
present value of the nonforfeitable accrued
benefit of the employee under the plan, or
(II) $10,000.

\*     \*     \*     \*     \*     \*     \*

(B) Requirement That Loan be Repayable within 5
years.--

(i) In General.-- Subparagraph (A) shall
not apply to any loan unless such loan, by
its terms, is required to be repaid within 5
years.

\*     \*     \*     \*     \*     \*     \*

(C) Requirement of Level Amortization.--Except as
provided in regulations, this paragraph shall not apply
to any loan unless substantially level amortization of
such loan (with payments not less frequently than
quarterly) is required over the term of the loan.

Sec. 72(p)(2)(A)(i) was amended by Tax Reform Act of 1986,
Pub. L. 99-514, sec. 1134(a), 100 Stat. 2085, 2483-2484.
Prior to the amendment, the statutory limit of $50,000 in section
sec. 72(p)(2)(A)(i) was not reduced by the excess, if any, of the
highest outstanding loan balance during the 1-year period ending
on the day before the date of the new loan, over the outstanding
balance of loans from the plan on the date on which the loan was
made.  This revision to sec. 72(p)(2)(A)(i) applies to loans
made, renewed, renegotiated, modified, or extended after Dec. 31,
1986.  Id.

plan loans does not exceed the lesser of: (i) $50,000, or (ii) the greater of $10,000 or half of the participant's vested accrued benefit under the plan; and (2) the loan, by its terms, requires repayment within 5 years. Sec. 72(p)(2)(A) and (B).

Section 72(p)(2)(C) was added by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1134(b), 100 Stat. 2085, 2484, and limits the exception in section 72(p)(2) to those loans that are required to be amortized in substantially level installments paid at least quarterly. This provision applies to loans made, renewed, renegotiated, modified, or extended after December 31, 1986. Id. Section 72(t)(1) imposes an additional tax on an amount received from a qualified retirement plan equal to 10 percent of the portion of such amount that is includable in gross income. Section 72(t)(2) exempts distributions from the additional tax if the distributions are made, inter alia: (1) To an employee age 59½ or older; (2) to a beneficiary (or the estate of the employee) on or after the death of the employee; (3) on account of disability; (4) as part of a series of substantially equal periodic payments made for life; (5) to an employee after separation from service after attainment of age 55; or (6) as dividends paid with respect to corporate stock described in section 404(k).

Section 61(a) includes as gross income all income from whatever source derived including, inter alia, interest and dividends. Sec. 61(a)(4), (7). Section 316(a) defines dividends as any distribution of property made by a corporation to its shareholders to the extent of earnings and profits. Dividends may be formally declared, or they may be constructive. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84.

A.    Substance-Over-Form Argument

Petitioners do not dispute respondent's calculations of the amounts of the distributions, interest, or dividends that flow from the plan or corporate loans. Nor do petitioners challenge the years in which respondent seeks to include the above amounts. Rather petitioners ask us to ignore the form of the loans and treat the loans as having been made from the Plan directly to the corporations. Petitioners contend that the Chapmans and the Christies obtained the plan loans for the purpose of advancing the proceeds to Dura-Craft and Springbrook in order for the corporations to avoid the prohibited transaction provisions pursuant to section 4975.[6] In other words, petitioners argue

---

[6]Sec. 4975 imposes two levels of excise tax on "any disqualified person who participates in [a] prohibited transaction". Sec. 4975(a) and (b). Sec. 4975 imposes an excise tax equal to 5 percent of the amount involved with the prohibited transaction. Sec. 4975(a) provides:

SEC. 4975(a). Initial Taxes on Disqualified
(continued...)

that the series of loans was not bona fide.[7]  The effect of
petitioners' recharacterization would be to relieve the Chapmans
and the Christies of any income tax consequences flowing from the
loans.  In addition, petitioners seek to characterize the excess
interest payments made by the corporations to or on behalf of
Milo Chapman and David Christie as bookkeeping errors subject to
correction pursuant to section 4975(f)(5).

---

[6](...continued)
Person.--There is hereby imposed a tax on each
prohibited transaction.  The rate of tax shall be equal
to 5 percent of the amount involved with respect to the
prohibited transaction for each year (or part thereof)
in the taxable period.  The tax imposed by this
subsection shall be paid by any disqualified person who
participates in the prohibited transaction (other than
a fiduciary acting only as such).

Sec. 4975(b) imposes an additional excise tax on the prohibited
transaction equal to 100 percent of the amount involved if the
transaction is not timely corrected.  The prohibited transactions
enumerated in sec. 4975© were designed to guard against over-
reaching by persons able to exert influence over the affairs of
the plan.  A prohibited transaction includes, inter alia, any
direct or indirect lending of money or other extension of credit
between a plan and a disqualified person.  Sec. 4975(c)(1)(B).
Disqualified persons are defined in terms of certain
relationships a person has with a plan.  Sec. 4975(e)(2).  Those
relationships include, inter alia, fiduciary, sec. 4975(e)(2)(A);
an employer whose employees are covered by the plan, sec.
4975(e)(2)(C); an owner of 50 percent or more of a corporation
any of whose employees are covered by the plan, sec.
4975(e)(2)(E); a member of the family of any individual described
within certain paragraphs in sec. 4975(e)(2), sec. 4975(e)(2)(F);
and any officer or director of a corporation which, among other
things, has employees covered by the plan, sec. 4975(e)(2)(H).

[7]The parties stipulated that the Plan was a profit-sharing
plan, and neither party disputed that the Plan was a qualified
plan for purposes of sec. 401 or a qualified employer plan for
purposes of sec. 72(p).

Respondent does not dispute the form in which petitioners have cast the loans in question. Instead, respondent argues that the Chapmans and the Christies have failed to recognize the income tax consequences flowing from the corporate and plan loans. Accordingly, we must decide whether petitioners should be permitted to repudiate the loans from the Plan to the Chapmans and the Christies and the loans from Milo Chapman and David Christie to the corporations.

A taxpayer's ability to disavow the form it has chosen for a transaction is circumscribed. Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1430 (1986); Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973). The Supreme Court has observed repeatedly that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Central Tablet Manufacturing Co. v. United States, 417 U.S. 673, 690 (1974); Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974). It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less. Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).

Petitioners' assertion that they used Milo Chapman and David Christie as intermediaries to avoid the excise tax of section 4975 is untenable.  Petitioners now are bound by the form of the loans that they have chosen and may not in hindsight recast the transaction in another form.  <u>Don E. Williams Co. v. Commissioner</u>, 429 U.S. 569 (1977); <u>Commissioner v. National Alfalfa Dehydrating & Milling Co.</u>, <u>supra</u>; <u>Lomas Santa Fe, Inc. v. Commissioner</u>, 693 F.2d 71, 73 (9th Cir. 1982), affg. 74 T.C. 662 (1980).

Petitioners seek to circumvent the above outcome by relying upon examples 3, 5, and 6 found in 29 C.F.R. sec. 2550.408b-1(a)(4) (1989), which they contend support treating the plan loans as prohibited transactions rather than as participant loans.  These examples provide in pertinent part:

> Example (2): P is a plan covering all the employees of E, the employer who established and maintained [the plan] P.  F is a fiduciary with respect to P and an officer of E.  The plan documents governing P give F the authority to establish a participant loan program in accordance with section 408(b)(1) of the [Employer Retirement Income Security Act of 1974] Act.  Pursuant to an arrangement with E, F establishes such a program but limits the use of loan funds to investments in a limited partnership which is established and maintained by E as general partner.  Under these facts, the loan program and any loans made pursuant to this program are outside the scope of relief provided by section 408(b)(1) because the loan program is designed to operate for the benefit of E.  Under the circumstances described, the diversion of plan assets for E's benefit would also violate sections 403(c)(1) and 404(a) of the Act.

> Example (3): Assume the same facts as in Example 2, above, except that F does not limit the use of loan

funds.  However, <u>E pressures his employees to borrow funds under P's participant loan program and then reloan the loan proceeds to E.  F, unaware of E's activities, arranges and approves the loans.  If the loans meet all the conditions of section 408(b)(1), such loans will be exempt under that section.  However, E's activities would cause the entire transaction to be viewed as an indirect transfer of plan assets between P and E, who is a party in interest with respect to P, but not the participant borrowing from P</u>.  By coercing the employees to engage in loan transactions for its benefit, E has engaged in separate transactions that are not exempt under section 408(b)(1).  Accordingly, E would be liable for the payment of excise taxes under section 4975 of the Code.

*   *   *   *   *   *   *

Example (5):  F is a fiduciary with respect to plan P.  <u>D is a party in interest with respect to plan P</u>.  Section 406(a)(1)(B) of the Act would prohibit F from causing P to lend money to D.  <u>However, F enters into an agreement with Z, a plan participant, whereby F will cause P to make a participant loan to Z with the express understanding that Z will subsequently lend the loan proceeds to D</u>.  An examination of Z's credit standing indicates that he is not creditworthy and would not, under normal circumstances, receive a loan under the conditions established by the participant loan program.  <u>F's decision to approve the participant loan to Z on the basis of Z's prior agreement to lend the money to D violates the exclusive purpose requirements of sections 403© and 404(a).  In effect, the entire transaction is viewed as an indirect transfer of plan assets between P and D, and not a loan to a participant exempt under section 408(b)(1)</u>.  Z's lack of credit standing would also cause the transaction to fail under section 408(b)(1)(A) of the Act.

Example (6):  F is a fiduciary with respect to Plan P.  Z is a plan participant.  Z and D are both parties in interest with respect to P.  F approves a participant loan to Z in accordance with the conditions established under the participant loan program.  Upon receipt of the loan, Z intends to lend the money to D.  If F has approved this loan solely upon consideration of those factors which would be considered in a normal commercial setting by an entity in the business of

making comparable loans, Z's subsequent use of the loan proceeds will not affect the determination of whether loans under P's program satisfy the conditions of section 408(b)(1). [Emphasis added.]

Petitioners misconstrue the scope of 29 C.F.R. sec. 2550.408b-1. Section 406(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 879, generally prohibits loans between a plan and a party-in-interest. Section 408(b)(1) of ERISA exempts loans to participants and beneficiaries if the loans meet certain requirements. The ERISA sec. 408(b)(1) exemption of ERISA parallels section 4975(d)(1). 29 C.F.R. sec. 2550.408b-1(v). The regulation merely explains the circumstances in which these exemptions are available for purposes of ERISA sec. 408(b)(1) and section 4975(d)(1).[8] The examples in 29 C.F.R. sec. 2550.408b-1 are merely illustrative of those circumstances; they do not purport to limit the situations in which section 72 may apply or to describe the income tax consequences of loans from a qualified profit-sharing plan.

We are satisfied that this is not a case in which petitioners are entitled to avoid the tax consequences arising

---

[8]ERISA and the Code provide an exemption from the prohibited transaction rules where loans are available to all participants on a reasonably equivalent basis, are not available to highly compensated employees in greater amounts, bear a reasonable rate of interest, and are adequately secured. See 29 C.F.R. sec. 2550.408b-1 (1989).

from their loan agreements on the ground that the loans reflected therein were not as documented.  Petitioners have not acted in accordance with what they argue is the substance of the loans. Rather, petitioners freely admit the purpose of the corporate and plan loans was to permit Dura-Craft and Springbrook to escape the imposition of the excise tax pursuant to section 4975. Petitioners now seek relief from the unforeseen tax consequences arising from the misrepresentation they deliberately perpetrated.

Petitioners may not disavow their chosen form of the loans on the belated assertion that the entire loan transaction was fictitious and was designed to avoid the prohibited transaction provisions of section 4975.  "One should not be garroted by the tax collector for calling one's agreement by the wrong name", Pacific Rock & Gravel Co. v. United States, 297 F.2d 122, 125 (9th Cir. 1961), but to allow petitioners "to disavow their prior representations, under such circumstances would invite similar intentional deceit on the part of other taxpayers seeking to gain a tax benefit", Cluck v. Commissioner, 105 T.C. 324, 332 (1995); Lefever v. Commissioner, 103 T.C. 525, 544 (1994), affd. 100 F.3d 778 (10th Cir. 1996).  Having determined that petitioners may not disavow the form of their loans, we turn to consider the tax consequences flowing from that form.

B.    Tax Consequences of Loans

1.    Plan Loans

First, we direct our attention to the income tax consequences of the plan loans.  Section 72(p)(1)(A) provides in pertinent part that "If during any taxable year a participant * * * receives (directly or indirectly) any amount as a loan * * *, such amount shall be treated as having been received * * * as a distribution under such plan."  (Emphasis added.)  Section 72(p)(2) carves out an exception permitting the tax-free withdrawal of funds from a qualified plan by a plan participant, in the form of a loan, if, inter alia, the terms of the loan prescribe a repayment period of 5 years or less.

Respondent contends that the legislative history of section 72(p)(2) interprets the statute to provide that any unpaid principal or interest is treated as distributed at the end of the 5-year period.  The legislative history of section 72(p) states in pertinent part:  "if payments under a loan with a repayment period of less than 5 years are not in fact made, so that an amount remains payable at the end of 5 years, the amount remaining payable is treated as if distributed at the end of the 5-year period."  H. Conf. Rept. 97-760, at 619 (1982), 1982-2 C.B. 600, 672 (emphasis added).  Respondent further argues that any interest accruing after the 5-year period but before the

loans are repaid is an additional distribution pursuant to section 72(p)(1).[9]

For clarity, we will address separately the applicability of section 72(p)(1)(A) to the principal and accrued interest of the plan loans. Petitioners do not dispute that the distribution of the $75,000, i.e., the principal of the plan loans, if it is taxable to them at all, is taxable in 1988, pursuant to the legislative history of section 72(p) as interpreted by respondent. Accordingly, we sustain respondent's determination that the Chapmans and the Christies each received a distribution from the Plan in the amount of $37,500 in 1988.[10]

We are not convinced, however, that Congress intended that interest accruing during or after the 5-year period be treated as a taxable distribution for purposes of section 72(p)(1). Respondent's argument relies upon the fiction that the accrued interest constitutes an additional loan. From the language of section 72(p)(1), it is apparent that, to be a taxable distribution, the loan amount must be received either directly or

---

[9]Respondent's argument assumes that Milo Chapman and David Christie were participants in the Plan and that the Plan loans otherwise satisfied the requirements of the exception in sec. 72(p)(2)(A). Petitioners do not challenge these assumptions.

[10]There seems to be a gulf between the language of the statute and the legislative history. In other circumstances, we might be concerned about this disparity, which indicates legislation by conference report rather than by concise statements in the statute. Taxpayers should not be compelled to look at legislative history to determine the tax consequences of their activities.

indirectly by the participant or beneficiary.  The accrued interest does not satisfy the requirement that the loan must be received to be a distribution.  Accordingly, we find that for purposes of section 72(p)(1) neither Milo Chapman nor David Christie received distributions in 1988 or 1989 equal to the interest in the amounts of $4,500 and $1,500 which accrued on the plan loans.

Section 72(t)(1) imposes an additional 10-percent income tax on amounts received from a qualified retirement plan. Petitioners do not claim to come within one of the enumerated exceptions of section 72(t)(2).  We sustain respondent's determination that the distributions of $37,500 are subject to the 10-percent additional income tax of section 72(t)(1).  Having decided, however, that the accrued interest amounts of $4,500 and $1,500 are not plan distributions, we find that section 72(t) does not apply to these amounts.

### 2.   Corporate Loans

We first consider whether the Chapmans and the Christies earned interest income in 1989 from the corporate loans to them. It is well settled that if a taxpayer's obligation is paid by a third party, the effect is the same as if the third party had paid the taxpayer who in turn paid his creditor.  Douglas v. Willcuts, 296 U.S. 1 (1935); United States v. Boston & M.R.R., 279 U.S. 732 (1929); Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929); Wall v. United States, 164 F.2d 462 (4th Cir.

1947).  Petitioners concede that Dura-Craft and Springbrook owed interest to Milo Chapman and David Christie in the amounts of $33,000 and $14,000 on their respective corporate loans.  Instead of paying the interest directly to the individual petitioners, the corporations paid the Plan.  Having found that petitioners may not disavow the loans, we must also conclude that the $47,000 in interest owed by the corporations to Milo Chapman and David Christie was paid to the Plan for their benefit and used to satisfy their own obligations with respect to the personal loans to them from the Plan.  Accordingly, we sustain respondent's determination that the Chapmans and the Christies each received interest income in the amount of $23,500 in 1989.

Finally, we must determine whether Milo Chapman and David Christie received dividend income in 1989 to the extent that the loan payments made by Dura-Craft and Springbrook exceeded the amounts actually owed to Milo Chapman and David Christie.[11] Petitioners contend that the excess loan payments should not be treated as dividends because those payments were bookkeeping errors, which should be corrected pursuant to section 4975(f)(5). Section 4975(f)(5) defines the terms "correction" and "correct" to mean "with respect to a prohibited transaction, undoing the transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it

_____

[11]We note that petitioners did not argue that the dividends exceeded the earnings and profits of the corporations.

would be if the disqualified person were acting under the highest fiduciary standards." (Emphasis added.)

Petitioners' reliance on section 4975(f)(5) is misplaced. It is evident from the above language that section 4975(f)(5) has no relevance to the income tax imposed upon dividend income arising from a corporation's conferring a benefit upon its shareholders. This is apparent from the structure of the Code. Section 4975(f)(5) is contained in subtitle D, chapter 43, whereas the provisions governing taxation of dividends are found in subtitle A, chapter 1. There is no cross-reference between section 4975(f)(5) and those provisions.

Petitioners further contend that bookkeeping errors do not give rise to a penalty tax, relying upon <u>Ahlberg v. United States</u>, 780 F. Supp. 625 (D. Minn. 1991). In <u>Ahlberg</u>, the sole beneficiary and administrator misallocated contributions between a pension plan and profit-sharing plan, the funds of which were maintained in a commingled mutual fund. The District Court granted summary judgment sua sponte, holding that the taxpayer was not subject to the excise tax of 5 percent for maintaining a plan with an accumulated funding deficiency. The court concluded that the misallocations were bookkeeping errors, from which the taxpayer did not receive any extra benefit, and that no harm came to the plans.

<u>Ahlberg</u> is distinguishable from the instant case. Unlike the taxpayer in <u>Ahlberg</u>, Milo Chapman and David Christie did

receive a benefit from the bookkeeping errors.  Corporate payments to third parties at the direction of shareholders, or in discharge of the shareholders' debts and liabilities, may constitute a constructive dividend.  Tennessee Sec. Inc. v. Commissioner, 674 F.2d 570, 573 (6th Cir. 1982), affg. T.C. Memo. 1978-434; Gardner v. Commissioner, 613 F.2d 160 (6th Cir. 1980), affg. T.C. Memo. 1976-349; Wortham Mach. Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975); Noble v. Commissioner, 368 F.2d at 442; Sachs v. Commissioner, 277 F.2d 879, 882 (8th Cir. 1960), affg. 32 T.C. 815 (1959); Yelencsics v. Commissioner, 74 T.C. 1513, 1529 (1980); Magnon v. Commissioner, 73 T.C. 980, 997 (1980).  Petitioners seek to distinguish the facts in many of the above cases from those in the instant case on grounds that are immaterial to the outcome.  The basic issue is whether the corporate expenditures were incurred primarily to benefit the corporations' trade or business or primarily for the benefit of the shareholders.  Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215 (5th Cir. 1978); Noble v. Commissioner, supra at 443; Magnon v. Commissioner, supra at 993-994.  When a corporation confers an economic benefit upon a shareholder in his capacity as such, without an expectation of repayment, that economic benefit becomes a constructive dividend, taxable to the shareholder whether or not the corporation intended to confer a

benefit upon him.  Loftin & Woodard, Inc. v. United States, supra at 1214; Noble v. Commissioner, supra at 443.

To the extent that Dura-Craft and Springbrook made payments to the Plan in excess of the amounts actually owed on the corporate loans, the corporations conferred an economic benefit. While Dura-Craft and Springbrook may have mistakenly paid too much principal and interest, those payments, nonetheless, satisfied the plan loans, which were the Chapmans' and the Christies' personal debts due to the Plan.  As such, they provided a taxable benefit to the individual petitioners.  We are satisfied that Milo Chapman and David Christie each received dividend income during 1989 in the amount of $4,250.[12]

I.   Issue 5.  Processing Fee

Finally, we must consider whether the 5-percent processing fees paid to Northwest and included as a part of Dura-Craft's cost of goods sold are allowable.  Section 61(a) includes "gross income derived from business" in its general definition of gross income.  Sec. 61(a)(2).  Gross income from business means total sales, less cost of goods sold, plus any income from investments and from incidental or outside operations or sources.  Sec. 1.61-3(a), Income Tax Regs.

---

[12]We express no opinion here as to any liability with respect to the excise tax of sec. 4975 with regard to the plan loans.

Respondent disallowed the processing fees on the grounds that the transactions were shams lacking a business purpose and economic substance. Petitioners, however, argue that the separate corporate entity status of Northwest should be recognized, citing the test in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), and the line of cases resting thereon.

We are not required to find Northwest was a sham in order to uphold respondent's determinations. The notice of deficiency focuses on the sham nature of the transactions rather than the sham nature of the corporation.

A "sham" transaction is one that lacks economic substance beyond the creation of tax benefits. Knetsch v. United States, 364 U.S. 361, 365-366 (1960); Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988). Petitioners bear the burden of proving that the challenged transactions were not shams. Rule 142(a); Sheldon v. Commissioner, 94 T.C. 738, 753 (1990).

Alternatively, petitioners appear to argue that the proper test for sustaining the deduction of the processing fee is the test in Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981). In Grodt, we set forth eight factors by which to determine whether the benefits and burdens of ownership have

passed and a sale has occurred between contracting parties.[13] While the shifting of benefits and burdens of ownership is a key indicator of the presence or a lack of economic substance, it is only one of several considerations. Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989).

The U.S. Court of Appeals for the Ninth Circuit, the circuit in which this case is appealable, Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), determines whether a transaction is a sham by the following two-part test: (1) Has the taxpayer shown a business purpose for engaging in the transaction other than tax avoidance? (a subjective test) and (2) has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits? (an objective test), Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990) (citing Bail Bonds By Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23), affg. T.C. Memo. 1987-628. This two-part test, however, is not

---

[13]The factors included:

(1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the sale of the property. [Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981); citations omitted.]

to be used as a "rigid two-step analysis."  Id. at 1363.
Instead, business purpose and economic substance are simply more precise factors to be considered in the application of the traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses.  Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988).

The business purpose factor often involves an examination of the subjective factors which motivated a taxpayer to enter into the transaction at issue.  Bail Bonds By Marvin Nelson, Inc. v. Commissioner, supra at 1549.  The economic-substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction.  Id.

Dura-Craft and Northwest, both of which acted under the effective control or direction of Milo Chapman and David Christie, were related parties.  In determining whether the form of a transaction between related parties has substance, we compare their actions with what would have occurred if the transaction had occurred between parties who were dealing at arm's length.  Maxwell v. Commissioner, 95 T.C. 107, 117 (1990). The question of whether an expense is lacking in economic substance is essentially a factual determination.  Commissioner

v. Heininger, 320 U.S. 467, 475 (1943); Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir. 1980), affg. 66 T.C. 1024 (1976).

Tax laws affect the shape of many business transactions. The parties to a transaction are entitled to take into account and to maximize favorable tax results so long as the transaction is compelled or encouraged by nontax business reasons. Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978); James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990). We agree with respondent, however, that the payments of the processing fees by Dura-Craft to Northwest were shams.

Dura-Craft is a subchapter C corporation, and Northwest is a subchapter S corporation as defined in section 1361. The profits of a C corporation are subject to corporate income tax, sec. 11, and any distributions to shareholders are then subject to the shareholders' personal income tax, secs. 61(a), 316. The profits of a subchapter S corporation, however, are generally not subject to a corporate tax, sec. 1371(a), but pass through to be taxed on the individual shareholders' returns, sec. 1366, thereby eliminating the double taxation of distributions to the shareholders of C corporations. Moreover, petitioners have failed to show that Dura-Craft had a business purpose in making the payments. Furthermore, the payments served no purpose other than the generation of tax benefits by shifting money and income between Dura-Craft and Northwest. The record is devoid of

evidence that services were provided or value was added by Northwest, while the tax benefits are quite apparent.  Northwest had no employees during the years at issue.  Moreover, Dura-Craft employees placed all of the orders in Dura-Craft office space and received all of the raw materials directly at the Dura-Craft plant.  Simply, there was no "arm's-length" reason beyond these tax benefits for Dura-Craft to compensate Northwest.

Based upon the entire record in this case, we conclude that Dura-Craft is not entitled to include the 5-percent processing fees paid to Northwest as part of its cost of goods sold for its taxable years ending October 31, 1988 and 1989.  We have considered all of the other arguments made by petitioners and, to the extent we have not addressed them, find them to be without merit.

To reflect the foregoing and concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.